UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANN RODRIGUEZ and
PATRICIA ADAMS,

                             Plaintiffs,               No. 07-CV-12578-DT

vs.                                     Hon. Gerald E. Rosen

DUE PROCESS OF MICHIGAN, INC.;
ROBERT J. REZNICK; ROBERT
McKENNA; and KEN PATTERSON.

                             Defendants.
_____/

OPINION AND ORDER GRANTING, IN PART, AND
DENYING, IN PART, ROBERT REZNICK'S AND DUE PROCESS
OF MICHIGAN'S MOTION FOR SUMMARY JUDGMENT

        At a session of said Court, held in
        the U.S. Courthouse, Detroit, Michigan
        on     September 30, 2008

        PRESENT:  Honorable Gerald E. Rosen
                     United States District Judge

## I. INTRODUCTION

    This is a multi-count action brought by Plaintiffs Ann Rodriguez and her 21-year-old daughter, Patricia Adams, seeking damages for alleged tortious acts of process servers in executing an Order to Seize Property issued by the 71-A District Court in Lapeer County, Michigan. The matter is presently before the Court on Defendants Robert Reznick's and Due Process of Michigan, Inc.'s Motion for Summary Judgment

[Dkt. # 95]. There is also before the Court a motion filed by Plaintiffs complaining about the conduct of Defendant Robert Reznick and his attorneys during the course of discovery in this matter, which the Court construes as a motion for discovery sanctions.[1] Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

### PLAINTIFF ADAMS' DEFAULT ON HER CAR LOAN AND THE PROCEEDINGS TO COLLECT ON HER INDEBTEDNESS

Plaintiff Patricia Adams financed the purchase of a used car through Credit Acceptance Corporation ("CAC"). The car allegedly broke down shortly after the purchase and Plaintiff Adams ceased making payments on the note.

CAC thereafter retained the law firm of Weber & Olcese, PLC, and the firm filed suit against Plaintiff Adams to collect on the defaulted note in the 71-A District Court in Lapeer, Michigan on January 11, 2006. Adams did not answer the complaint and Weber & Olcese properly filed an application for default judgment and obtained a judgment on

---

[1] This motion is captioned "Plaintiffs' Motion to Advise the Court of Defendant Reznick's Fraudulent and Obstructionist Conduct and Requested [sic] that He Present Himself for Deposition for Matter He Did Not Testify Truthfully About or Concealed and for Discovery of Matters He Testified Untruthfully About and Failed to Disclose." [docketed as a "Motion for Sanctions" at Dkt. # 81].

March 1, 2006.[1]  On April 11 and May 10, 2006, the firm filed two requests for periodic garnishment that were issued and served on Plaintiff Adams' employers.  The judgment not being satisfied by the garnishments, Weber & Olcese submitted a Request for Order to Seize Property (a/k/a  "writ of execution") to the 71-A District Court.  The writ of execution was filed and signed by the 71-A District Court Judge on August 17, 2006.

Weber & Olcese made the request for Order to Seize Property on a standard Michigan State Court Administrative Office ("SCAO") form. [*See* Defendants' Ex. 3.] Carol Anthony, a former Weber & Olcese employee, testified that she was the person who prepared the Request for Order to Seize Property form.  Below the blank provided on the form for "Order to be Served By" is printed "Court officer/Deputy Sheriff."  Ms. Anthony testified that although Weber & Olcese frequently utilized the services of Defendant Robert Reznick to execute seizure orders, she did not put his name in the "Order to be Served By" space on the form in this case.  Instead, she circled "Deputy Sheriff" and also hand wrote "Deputy Sheriff" in the space provided.  Ms. Anthony explained that while some courts are "open" courts and allow parties requesting the issuance of an Order to Seize Property to select their process servers themselves and fill in the name of the person they want to serve the Order, the 71-A District Court in Lapeer is a "closed" court and does not permit this.[2]

---

[1] The default judgment was in the principal amount of $9,607.55.

[2] Ms. Anthony testified that although she did not fill in any name on the form, she believed that Defendant Reznick would be the person who would be assigned to serve the order because she knew that Reznick frequently worked in Lapeer County and he had

## DEFENDANTS McKENNA AND REZNICK'S APPOINTMENT AS COURT OFFICERS TO EXECUTE JUDGMENTS

Until some time in 2003 or 2004, the 71-A District Court required that all writs of execution be served by Deputy Sheriffs. [*See* Deposition of Robert McKenna, Defendants' Ex. 5, p. 70]. Hence, it was not uncommon for lawyers seeking writs of execution in Lapeer County to indicate that the order was to be served by a deputy sheriff. *Id.* at p. 74. The Sheriff's Department, however, decided some time in 2003 or 2004 that, due to lack of manpower, it was no longer able to do seizures or evictions. [Deposition of Gregory Wise, Plaintiff's Ex. K, p. 48.] The Lapeer District Court, therefore, decided to "privatize" the function, and took advantage of the Michigan Statutes and Court Rules allowing the court to appoint its own "Court Officers."[3] *Id.*; *see also* McKenna Dep. p. 70.

According to Defendant Robert McKenna, when Lapeer decided to privatize, he and Robert Reznick arranged a meeting with the Lapeer County Chief Judge, the Honorable Nick O. Holowka, whom McKenna and Reznick knew from Judge Holowka's time as a county prosecutor. (At that time, McKenna was a Michigan State Police Trooper and Reznick was a Lapeer County Deputy Sheriff.) They told the Judge that they were interested in applying to be Court Officers and Judge Holowka agreed to appoint them. [McKenna Dep. pp. 72-73.] They each obtained and presented a bond to the Court, signed an "Independent Contractor Agreement for Court Officer," *see* Plaintiffs' Ex. N,

_____

told her that "he knew people there." [Anthony Dep., p. 91.]
   [3] *See* M.C.L. § 600.1801; M.C.R. 3.106(B).

and they were appointed as Court Officers for the 71-A District Court approximately

three weeks later. *Id.* at p. 73.

As provided in his Court Officer Agreement, McKenna received no salary or

wages from the court. For his services, he was paid only the statutory fees as provided in

M.C.L. §§ 552.23; 600.2555; and 600.2559. At the time, these statutes provided for

payment of $27.00,[4] plus mileage, plus the actual and reasonable expense for seizing and

storing any property seized, and a fixed percentage of any monetary seizure or the

proceeds of any sale of property -- 7% of the first $5,000.00 and 3% of any amount

exceeding the first $5,000.00.

McKenna testified that it was his understanding that in 2006, the 71-A District

Court used a "rotation" system for assignment of seizure orders to the Court Officers for

execution.[5] His own personal practice was to either personally pick up, or have his son-

in-law, Defendant Kenneth Patterson, a sales person who was in Lapeer three or four

times a day, pick up orders from the court for him to execute, and bring them to his home

in Davison, Michigan. *Id.* at p. 109; *see also* Patterson Dep., Defendants' Ex. 6, pp. 34-

---

[4] The statutory fee has since been increased to $32.00.

[5] Gregory Wise, who became the 71-A District Court administrator in June 2007, testified that after he became court administrator, some Court Officers complained that they were not getting their proper share of the work. [Wise Dep., Plaintiff's Ex. L, p. 26.] He said he sensed that the court clerks were taking it upon themselves to decide to whom each writ should be assigned. *Id.* Therefore, he changed the procedure and testified that he instructed the court clerks that they are to give the list of approved Court Officers to the plaintiffs or the plaintiffs' attorneys and have them tell the court who they wanted to use to execute the orders. *Id.*

37.[6]  McKenna would then endorse the orders and proceed with execution.  One of the Orders Patterson picked up and delivered to McKenna was the Order to Seize Property to satisfy CAC's Judgment against Patricia Adams.[7]

SERVICE OF THE ORDER TO SEIZE PROPERTY UPON PLAINTIFF ADAMS

At 8:30 p.m. on September 5, 2006, Defendants McKenna and Patterson served the Order to Seize Property on Patricia Adams at her home in North Branch, Michigan.[8] Ms. Adams claims that Defendants announced that they were sheriff's deputies and that they wanted to talk to her inside the house. [Adams' 11/1/07Affidavit, Plaintiffs' Ex. 3,

---

[6]  Patterson also assisted McKenna when he executed seizure orders as permitted under McKenna's contract with 71-A District Court.  *See* Plaintiff's Ex. N, § 6.2. Patterson explained that he worked his day job, as a Schwepps beverages salesperson, and also would assist with writs of execution when he had time in the evening. [Patterson Dep., pp. 18-21.] Patterson also testified that he has also helped Rob Reznick with writs of execution, doing so perhaps once a month.  *Id.* at p. 18.

[7]  It is unexplained why the Court's "Register of Actions" on the *Adams* case indicates "Papers to Rob Reznick."  *See* Plaintiffs' Ex. 6.  McKenna surmises that he was given the Order simply because he was next in line under the rotation system he believed was used by the Court at the time.  Gregory Wise, the current court administrator at the 71-A District Court, testified that the court's only concern was that the Order be served by someone on the list of duly appointed Court Officers and since both Reznick and McKenna were on the list and "grouped"on the list along with another Court Officer, King, under the business name "Due Process of Michigan," there would be no prohibition against McKenna serving the Order, adding that it was, therefore, not uncommon for one of these three officers' names [Reznick, McKenna or King] to appear on the register only to have the Order served by one of the other two. [*See* Wise Dep., pp. 34-35.]  In any event, it is undisputed that Reznick never received the *Adams* seizure order and did not execute it; McKenna and Patterson did.

[8]  This is the address given on the 71-A District Court papers as Patricia Adams' residence, and it is undisputed that Ms. Adams was living there at the time.  The home, however, was apparently owned by Ms. Adams' mother, Ann Rodriguez.  *See* Adams Affidavit, Plaintiffs' Ex. 3, ¶ 3.

¶¶ 4 and 5.][9]  She alleges that, once inside the house, McKenna showed her the Order to Seize Property, *id.* ¶ 7, demanded money, and threatened to take all of the personal property in the house to satisfy her default judgment. *Id.* ¶¶ 8, 10.[10]  Adams also claims that McKenna told her that "their boss, Rob Reznick, had instructed them to get some money to satisfy the debt." *Id.* ¶ 8. (As discussed below, McKenna and Reznick both deny that Reznick was McKenna's "boss." They both, in fact, testified, that Reznick played no part in executing the seizure order at issue in this case.)  She further alleges that she and her three siblings were ordered to remain in the kitchen area of the house, and that McKenna and Patterson threatened to have them arrested if she did not give them some money. *Id.* ¶ 14.

Ultimately, Adams' 18-year-old boyfriend, Jacob Schlaud, appeared and gave Adams $200 he allegedly borrowed from his family to give to McKenna and Patterson.

---

[9]  It is unknown whether either Plaintiff Adams or her mother, Ann Rodriguez, were ever deposed in this case as none of the parties has submitted a copy of, or any excerpt from, any such deposition.

[10]  This demand was in accordance with the terms of the Order to Seize Property. The Order explicitly provided, in pertinent part:

> TO ANY SHERIFF, DEPUTY SHERIFF, OR COURT OFFICER -- YOU ARE ORDERED TO:
>
> 1.  Seize and sell, according to law, any of the personal property (as determined by the officer) of defendant(s) named above in the Request and Verification that is not exempt from seizure as will be sufficient to satisfy plaintiff's demand, costs, any statutory fees and expenses. Personal property may include, but is not limited to, motor vehicles or money, wherever located.

[Defendants' Ex. 3.]

*Id.* ¶ 18.  Plaintiff claims that McKenna informed her that $200 was not enough.  *Id*. at ¶

18. Mrs. Rodriguez, who was not present when McKenna and Patterson had arrived at the

house, then returned home and allegedly offered to give McKenna a post-dated check.  *Id.*

at 19.  According to Adams, McKenna said he would "have to check with his boss, Mr.

Reznick, before he could accept the offer of payment by post-dated check."  *Id*. at 20.

McKenna then allegedly called Reznick who supposedly instructed him to demand that

the post-dated check be in the amount of $400.  (As indicated, both McKenna and

Reznick deny any participation on Reznick's part and further deny that any telephone call

was ever made to him regarding the post-dated check payment of $400 or anything else

concerning the execution.  *See* McKenna Dep., p. 236.)  Mrs. Rodriguez complied and

made out a check dated the next day for $400, and gave it to the men.  *Id.* at 22.

McKenna, in turn, gave Adams a Receipt for Execution Against Property indicating the

payment of $600 -- $400 by check and $200 in cash.  *See* Plaintiffs' Ex. P.  Ms. Adams

also agreed in writing to make additional bi-weekly payments of $150 starting September

19, 2006 until the total Judgment is paid in full.  *Id.*[11]  McKenna and Patterson then left

the house.  *Id.*   Later McKenna filled out, signed and subsequently filed with the court an

---

[11]  The Receipt for Execution Against Property and future payment agreement was signed by both McKenna and Adams.  Pre-printed instructions on this Receipt direct that
Payments are to be postal money orders only and made out and sent to:
Rob Reznick
P.O. Box 4148
Flint, MI 48504-0148
However, Adams has made no payments whatsoever after paying $600.00 on the date of execution of the Order to Seize Property.

SCAO Partial Payment Receipt form. [*See* Defendants' Ex. 8.][12]

<u>DUE PROCESS OF MICHIGAN, INC.</u>

Due Process of Michigan, Inc. ("DPM") was incorporated in 1993.  Robert

Reznick is listed as the company's registered agent in the records on file with the

Michigan Department of Labor, Corporation Division. [Available on WESTLAW,

Michigan Corporate Records & Business Registration (CORP-MI) Database.] Jeffrey

Weber testified that he believed Mr. Reznick to be "an owner of Due Process." [Weber

Dep., Plaintiffs' Ex. C, p. 101.] Ken Patterson testified that he knows DPM to be "Rob

Reznick's company" and that it is "his business he runs for doing his court work."

[Patterson Dep., Defendants' Ex. 6, p. 20.]

Robert McKenna's Independent Contractor Agreement with the 71-A District

Court indicates that McKenna was "doing business as Due Process of Michigan, Inc." at

the time of his appointment as a Court Officer.  [*See* Plaintiffs' Ex. N.][13]  The Agreement

lists the following as McKenna's business and home addresses and phone numbers:

---

[12] The receipt also indicates that McKenna collected $600 from plaintiff Adams: $200 in cash, and $400 in the form of a check.

[13] Although presumably Defendant Reznick also has a contract with the 71-A District Court, a copy of his contract has not been provided to the Court.

|                    |                        |
|--------------------|------------------------|
| (business address) | P.O. Box 4148          |
| (city, state, zip) | Flint, MI 48504-0148   |
| (business)         | 810-430-1111           |
| (pager)            | 586-470-1335           |
| (business fax)     | 810-530-3333           |
| (home address)     | 5184 Oakhill Dr.       |
| (city, state, zip) | Swartz Creek, MI 48473 |
| (tax ID#)          | 38-3196050             |

[Plaintiff's Ex. N.]

The Flint Post Office Box address listed as McKenna's business address on his Court Officer Agreement, however, is actually the address Robert Reznick uses for "Due Process of Michigan." [*See* Reznick Dep., Defendants' Ex. 10, pp. 186-87.] The business phone number is also that of DPM. [*See* Plaintiffs' Ex. P.] The pager number listed is Robert Reznick's pager number. [*See* Plaintiffs' Ex. P; *see also* Plaintiffs' Motion for Sanctions, Ex. 11.] As for the home address, McKenna testified that he lives in Davison, Michigan, not Swartz Creek. [*See* McKenna Dep., Defendants' Ex. 5, p. 109.] "5184 Oakhill Drive, Swartz Creek, Michigan" is Reznick's address. [*See* Corporate record of Due Process of Michigan, Inc., available on WESTLAW, Michigan Corporate Records & Business Registration (CORP-MI) Database.]

Gregory Wise testified that three Lapeer 71-A Court Officers are listed on the Court's approved Court Officer list under the heading "Due Process of Michigan" -- Robert McKenna, Robert Reznick and Eric King. [Wise Dep., Pl.'s Mtn. to Join Defendants, Ex. 1, p. 23.] Wise testified,

I believe they all work for or under Due Process of Michigan. That's their

business name. I don't know whether it is incorporated [or a] partnership , but that's the business name they use. . . .

* * *

. . . [M]y understanding was that they do business as Due Process or are employees of Due Process, but the business name Due Process includes the three of them as individuals.

*Id.*

Wise also testified that all of the orders to seize property which may be assigned to either McKenna, Reznick or King are placed in a mailbox in the lobby of the first floor of the courthouse marked "Due Process." *Id.* at 42. Ken Patterson testified that the box in the Lapeer District Court from which he would pick up writs of execution for McKenna was labeled "Due Process." [Patterson Dep., p. 37.]

Notwithstanding the d/b/a reference in the Court Officer Agreement, the use of DPM's and Reznick's addresses and phone numbers, and the label on the mailbox in the 71-A District Court, Mr. McKenna testified he was not an employee of DPM or Robert Reznick.[14]

Although he denied having any employer-employee relationship with DPM, McKenna did acknowledge that he had "a working relationship with Mr. Reznick," and admitted that he would on occasion "help [Reznick] out" with his [Reznick's] executions. [McKenna Dep., p. 148, 64.] He also explained that he routinely engaged Reznick's

_____

[14] Carol Anthony, a former employee of Weber & Olcese, testified that she believed that Robert McKenna "worked under Robert Reznick" but when questioned as to the basis of her belief she was very vague and unable to provide substantiation. [*See* Anthony Dep., Plaintiffs' Ex. H, pp. 110-111.]

services for the paperwork entailed with his [McKenna's] executions,

> A:    He [Reznick]'s been in the business, he's established as far as record keeping, the bookkeeping and everything else.  So what happens is I take the paperwork, I give it to Mr. Reznick, Mr. Reznick takes [the money I collected] and signs -- or makes out the check [for the amount of money I collected], sends it to the plaintiff's attorney, he keeps the paperwork, and then I pay him for those services.

* * *

> Q:    So on orders to seize property -- and I think you testified Mr. Reznick never helps you to execute orders to seize property that have been assigned to you?

> A:    That's right.

> Q:    However, when you take the money, you turn over 60 percent of the money to Mr. Reznick to do bookkeeping?

> A:    Forty percent to do bookkeeping.

> Q:    You give him 40 percent to do bookkeeping?

> A:    And to track payments.  That's a big job right there, tracking payments.

> Q:    And to track payments.  How does Mr. Reznick track payments?

> A:    The people that we do the writs on, if we put them on a payment plan, they are given -- they have to make bi-weekly payments of whatever we agree upon.  Those bi-weekly payments are mailed to Rob Reznick at his post office box. He takes them, he logs them in, he sends the money on to the attorney and he keeps all [the records.]

[McKenna Dep., pp. 148-49.]

Robert Reznick's testimony is consistent with McKenna's:

A:      I do the accounting and paperwork for Mr. McKenna when he
        does writs of execution.  We run the money through Due
        Process of Michigan, send the checks to the plaintiff's
        attorney, and I am compensated for that.

Q:      How much are you compensated for that?

A:      Approximately 40 percent of the costs.

Q:      And when you say 40 percent of the costs, what do you
        mean?

A:      Mr. McKenna fills out a receipt on a writ of execution and
        fills in what the costs are, the service fee, the mileage fee, the
        percentage, whatever it was, the man hours, whatever
        additional expenses there are, and then they pay themselves
        out of that writ and then they turn the plaintiff's money and
        the 40 percent, what is left out of the costs, over to me.

[Reznick Dep., Defendants' Ex. 10, pp. 56-57.]

Reznick testified that he provides bookkeeping and payment tracking services for

a number of Court Officers and, in return, as with the arrangement with McKenna, he

receives from them 40 percent of the statutory percentage.  [Reznick Dep., Plaintiffs' Ex.

H, pp. 160-162.]

PLAINTIFFS' COMPLAINT

On May 24, 2007, Plaintiffs Ann Rodriguez and Patricia Adams filed a 15-Count

Verified Complaint for damages in the 71-A District Court in Lapeer, Michigan naming

as party-defendants, Credit Acceptance Corporation, the financers of the car purchased

by Plaintiff Adams; Weber & Olcese, PLC, the law firm retained by CAC;[15] Due Process

of Michigan, Inc. and its owner, Robert J. Reznick; and Robert McKenna and Ken

Patterson.[16]  The case was timely removed to this Court on federal question grounds on

June 15, 2007.

Plaintiffs allege in their Complaint that Ms. Rodriguez, Ms. Adams, and their

entire family were "severely traumatized" by the conduct of Mr. McKenna and Mr.

Patterson on September 5, 2006.  Specifically, Plaintiffs complain that McKenna and

Patterson "harassed, abused and oppressed" them in executing the Order the Seize

Property.  Plaintiffs allege that McKenna and Patterson "gained entry into the Rodriguez

home by trickery and deceit by falsely causing Adams to believe that they were Sheriff's

deputies on law enforcement business, threatened to confiscate furniture belonging to the

non-debtor, Rodriguez, refused to leave the premises despite numerous requests to do so,

and extorted money from non-debtors, Rodriguez and Schlaud, as a condition of leaving

the premises and not wrongfully confiscating Rodriguez's personal property." [Second

Amended Complaint, ¶ 50.]  Plaintiffs further allege that Reznick, on behalf of Due

Process, sent McKenna and Patterson to execute the Order to Seize as Due Process.

---

[15]  CAC and Weber & Olcese are no longer parties to this action.  CAC was dismissed from this action by stipulated order on November 19, 2007.  Plaintiffs settled with Weber & Olcese on September 17, 2008.

[16]  By leave of Court, Plaintiffs' filed an Amended Complaint on March 3, 2008 to add two additional defendants, the 71-A District Court and Gladwin County.  (A Second Amended Complaint was filed on April 10, 2008 to correct typographical errors.)   These two additional defendants, however, were dismissed by stipulated orders on June 24 and September 9, 2008, respectively.

As theories of recovery, Plaintiffs allege a claim of violation of their civil rights under 42 U.S.C. § 1983 against all of the defendants (Count I); a claim of violation of the Michigan Consumer Protection Act, against all defendants (Count III);[17] claims of conspiracy in violation of 42 U.S.C. § 1985 (Count IV) and in violation of state law (Count V); state common law claims of trespass (Count VI), fraud (Count VII), abuse of process (Count VIII), false imprisonment (Count IX), intentional inflection of emotional distress (Count X), intrusion (Count XI), conversion of money (Count XII), and extortion and threats (Count XIII); violation of the Michigan Occupational Code (Count XIV); and violation of the Michigan Debt Collection Practices Act (Count XV). All of these state law claims in Counts III, and V-XV are asserted "Defendants, in their individual and representative capacities," collectively.

Defendants Robert Reznick and Due Process of Michigan now move for summary judgment on all of Plaintiffs' claims against them.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[17] Plaintiffs' Second Amended Complaint also contained a Count II alleging a claim of violation of the Fair Debt Collection Practices Act (the "FDCPA") against Defendants CAC and Weber & Olcese, only. However, as neither CAC nor Weber & Olcese are any longer parties in this action, Plaintiffs' Count II claims against them will be dismissed.

judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[18]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

---

[18]"[T]aken together these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials. . . ."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure 3d</u>, § 2727.

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding the Defendants' summary judgment motion in this case.

## B. PLAINTIFFS STIPULATE TO THE DISMISSAL OF COUNTS IV AND XIV

As an initial matter, the Court notes that in their Response Brief, Plaintiffs stipulate to the dismissal of two counts on which Defendants seek summary judgment -- Count IV, Plaintiffs' claim of conspiracy under 42 U.S.C. § 1985, and Count XIV, Plaintiffs' claim of violation of the Michigan Occupational Code. Accordingly, Defendants' motion for summary judgment on these two counts will be granted and the claims asserted by Plaintiffs therein will be dismissed, with prejudice.

## C. PLAINTIFFS' SECTION 1983 CLAIM AGAINST DEFENDANTS REZNICK AND DUE PROCESS OF MICHIGAN

In Count I of their Second Amended Complaint, Plaintiffs allege a claim of violation of their civil rights under 42 U.S.C. § 1983 against Defendants Reznick and DPM predicated upon the alleged violation of their Due Process and Fourth Amendment

rights by Defendants McKenna and Robertson in their September 5, 2006 execution of the Order to Seize Property.

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983's purpose is to guard against the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. . . ." *Monroe v. Pape*, 365 U.S. 167, 184 (1961) (quoting *United States v. Classic*, 313 U.S. 299 (1941)). Two elements are necessary to state a cause of action under 42 U.S.C. § 1983: the plaintiff must plead and prove (1) that some person has deprived him of a federal right, and (2) that the person has done so under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

As indicated, it is fundamental that only those acting "under the color of law" may incur liability under 42 U.S.C. §1983. A private party may be only deemed to be a "state actor" if the party's actions are "fairly attributable to the state." *See Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998). Decisions as to whether a private action may be considered a "state action" are fact specific and made on a case-by-case basis. There is no one

determining factor, or set of circumstances, that cause a private action to be *per se* "under the color of law;" therefore, a court must look to the specific facts of each case to reach a decision. *Brentwood Academy vo. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

Here, though McKenna and Reznick were appointed by the 71-A District Court as Court Officers pursuant to Agreements purporting to negate any employer-employee relationship with the Lapeer County court and designating them only as "Independent Contractors," they may nonetheless be classified as "state actors" for § 1983 purposes.

As the Supreme Court made clear in *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250 (1988),

> The fact that the State employed [defendant] pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other "state employees" does not alter the [§ 1983] analysis. **It is the [defendant]'s function within the state system, not the precise terms of his employment that determines whether his actions can fairly be attributed to the State**.

487 U.S. at 55-56, 108 S.Ct. at 2259 (emphasis added).

*See also Griffin v. Maryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 1773 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity. . . .")

Here, Michigan state law, by statute, directs that

Whenever a judgment is rendered in any court, execution to collect the

same may be issued to the sheriff, bailiff, or other proper officer of any county, district, court district or municipality of this state.

M.C.L. § 600.6001.

Michigan courts have construed this statute to mean that only sheriffs, bailiffs or court officers may serve executions. *See In re Fees of Court Officer*, 222 Mich. App. 234, 564 N.W.2d 509 (1997) ("While any legally competent adult (not a party) may serve a writ of garnishment, M.C.R. 2.103(A), executions may be levied only by sheriffs, bailiffs and court officers, M.C.L. § 600.6001; M.S.A. § 27A.6001." 564 N.W.2d at 514 n. 6.)

In *Menken v. 31st District Court*, 179 Mich. App. 379, 445 N.W.2d 527 (1989), the Michigan appellate court explained that the district court has the same supervisory function over court officers appointed to serve writs requiring the seizure or attachment of property that it has over any court employee:

> A presiding district court judge has complete administrative authority as to the functioning of the court within his judicial district. Along with this authority comes the right to appoint all of the court's employees and court officers, and the responsibility to supervise their actions. As such, the presiding judge is in a position to personally evaluate the diligence, discretion and integrity of the court officers serving writs of attachment issued by his court. Accordingly, the appointing judge retains a measure of supervision over the service of process and maintains his ability to insure the sound administration of justice within his judicial district.

445 N.W.2d at 529.

Based upon the foregoing authorities, the Court finds that, as duly-appointed Court Officers of the 71-A District Court, McKenna and Reznick may properly be

classified as state actors for purposes of the Section 1983 analysis in this case.

1.     ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON
       PLAINTIFFS' SECTION 1983 CLAIM AGAINST DEFENDANT
       REZNICK

Defendant Reznick does not argue that he was not a "state actor" but rather that

summary judgment should be entered in his favor on Plaintiffs' Section 1983 claim

because he claims to have had no involvement with the execution of the Order to Seize

Property.  Plaintiffs do not dispute that Reznick was not present at their home when

Defendants McKenna and Patterson executed the Order.  However, Plaintiff Adams has

submitted a sworn affidavit in which she states that McKenna called "his boss, Rob

Reznick" while executing the order to ask whether he could accept a post-dated check

and Reznick allegedly "instructed" McKenna to demand a check for $400.  *See* Adams

Affidavit, Plaintiffs' Ex. 3, ¶¶ 20-21.

*Respondeat superior* may provide a basis for liability under Section 1983 if the

plaintiff shows "that the supervisor encouraged the specific incident of misconduct or in

some other way directly participated in it."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th

Cir. 1984).  Although both Defendant Reznick and Defendant McKenna denied in their

depositions that any phone call as alleged by Plaintiff Adams was made, the Court cannot

resolve such a factual dispute in deciding a summary judgment motion.  This factual

dispute, coupled with the evidence of some kind of a "business relationship" between

Reznick and McKenna, and McKenna's and Patterson's admission that they and Reznick

sometimes worked together in executing seizure orders persuade the Court that summary judgment dismissing Plaintiff's § 1983 claim against Defendant Reznick would not be appropriate.

2. ASSUMING McKENNA WAS AN INDEPENDENT CONTRACTOR OF DPM, THE CORPORATION CANNOT BE HELD LIABLE UNDER § 1983 FOR HIS ACTIONS

Plaintiffs also seek to hold DPM liable under § 1983 for the actions of Defendant McKenna and his assistant, Defendant Patterson, in executing the Order to Seize Property in this case. Their theory is that McKenna worked for DPM, either as an employee or an independent contractor. The evidence, however, does not bear this out. McKenna's employment -- as an independent contractor -- was with the 71-A District Court.

Nonetheless, McKenna admittedly had a business relationship with DPM. Assuming, without deciding that this was some sort of "independent contractor" relationship, there is still no legal basis for holding DPM liable under Section 1983 for McKenna's actions. It is well-settled that a corporation cannot be vicariously liable under § 1983 for the acts of an employee *or* independent contractor. *See e.g., Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *Powell v. Shopco Laurel Co.*, 678 F.2d. 126, 128 (7th Cir. 1982); *Rojas v. Alexander's Dep't Store, Inc*., 924 F.2d 406 (2nd Cir.1990); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir.1993); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Meinhart v. Campbell*, ___ F. Supp. 2d ___, 2008

WL 1860273 (W.D. Ky., Apr. 24, 2008); *Auvaa v. City of Taylorsville*, 506 F. Supp. 903, 909 (D. Utah 2007). These cases all rely on the Supreme Court's holding in *Monell v. Department of Social Serv.,* 436 U.S. 658 (1978). Though *Monell* involved a municipal corporation, as the Sixth Circuit observed in *Street*, "every circuit to consider the issue has extending the [*Monell*] holding to private corporations, as well." 102 F.2d at 818 (quoting *Harvey v. Harvey*, 949 F.2d 1127 1129-30, (11th Cir. 1992).)

It is only where the plaintiffs can show that the corporation directly caused the constitutional violation by instituting an official policy of some nature that was the "direct cause" or "moving force" behind the constitutional violations that a corporation may be held liable for the acts of its employees. *See Auvaa, supra*, (citing *Pembauer v. City of Cincinnati*, 475 U.S. 469, 480-85 (1986) and *City of Oklahoma v. Tuttle*, 471 U.S. 808 820 (1985).) Plaintiffs here have not even alleged, let alone proven, that DPM has any such official policy. Furthermore, Plaintiffs have provided no evidence suggesting that such a policy was the direct or moving force behind the alleged constitutional violations.

For the foregoing reasons, the Court finds that Plaintiffs' Section 1983 claim against Due Process of Michigan is without merit. Therefore, Defendants' motion for summary judgment on this claim will be granted.

D.    PLAINTIFFS HAVE FAILED TO MAKE OUT A CLAIM OF
       <u>VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT</u>

In Count III of their complaint, Plaintiffs allege that Defendants (collectively)

violated the Michigan Consumer Protection Act, M.C.L. § 445.901 *et seq*. "by engaging in harassing, abusive, oppressive, unfair, deceptive and misleading means to satisfy [a] money judgment against Plaintiff Adams."

The Michigan Consumer Protection Act ("MCPA") prohibits "unfair, unconscionable or deceptive, methods, acts or practices in the conduct of trade or commerce." M.C.L. § 445.903. While the statute broadly defines "trade or commerce" as "the conduct of a business providing goods, property or services primarily for personal, family, or household purposes," M.C.L. § 445.902(d), it is clear that Defendants were not engaged in providing Plaintiffs with "goods, property or services primarily for personal, family or household purposes," so as to given them standing to sue Defendants under the statute. As the Michigan Court of Appeals noted in *Zine v. Chrysler Corp*., 236 Mich. App. 261, 271 (1999), "The intent of the [MCPA] is 'to protect consumers in their *purchases* of goods [or services] which are primarily used for personal, family or household purposes." *Id*. at 271 (quoting *Noggles v. Battle Creek Wrecking*, 153 Mich. App. 363, 367 (1986)) (emphasis added.). Plaintiffs were not engaged in the purchase or lease of goods or services.

Furthermore, even if Plaintiffs do have standing to sue under the Act for the actions complained of, only the "unfair, conscionable, and deceptive" practices defined in § 3 of the Act, M.C.L. § 445.903, are prohibited, and even a cursory review of the 38 enumerated prohibited activities in that section shows that none are applicable to the debt

collection actions at issue in this case.[19]

[19] M.C.L. § 445.903 provides as follows:

(1) Unfair, unconscionable or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows:

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(b) Using deceptive representations or deceptive designations of geographic origin in connection with goods or services.

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship approval, status, affiliation, or connection that he or she does not have.

(d) Representing that goods or services are new if they are deteriorating, altered, reconditioned, used or secondhand.

(e) Representing that goods or services are of a particular standard, quality or grade, or that goos are of a particular style or model, if they are of another.

(f) Disparaging the goods, services, business, or reputation of another by false or misleading representation of fact.

(g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.

(h) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity in immediate conjunction with the advertised goods or services.

(i) Making false or mispeading statmemtns of fact concerning the reason for, existence of, or amounts of price reductions.

(j) Representing that a part, replacement, or repair service is needed when it is not.

(k) Representing to a party to whom goods or services are supplied that the goods or services are being supplied in response to a request made by or on behalf of the party, when they are not.

(l) Misrepresenting that because of some defect in a consumer's home, the health, safety, or lives of the consumer or his or her family are in danger if the product or services are not purchased, when in fact the defect does not exist or the product or services would not remove the danger.

(m) Causing a probability of confusion or of misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction.

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

(o) Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction.

(p) Disclaiming or limiting the implied warranty of merchantability and fitness for use, unless a disclaimer is clearly and conspicuously disclosed.

(q) Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided.

(r) Representing that a consumer will receive goods or services "free" or "without charge", or using words of similar import in the representation without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(t) Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it.

(u) Failing, in a consumer transaction that is rescinded, canceled, or otherwise terminated in accordance with the terms of an agreement, advertisement, representation, or provision of law, to promptly restore to the person or persons entitled to it a deposit, down payment, or other payment, or int eh case of property traded in but not available, the greater of the agreed value or the fair market value of the property, or to cancel within a specified time or an otherwise reasonable time an acquired security interest.

(v) Taking or arranging for the consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, if the merchant knows or has reason to know that the statement is not true.

(w) Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(x) Taking advantage of the consumer's reasonably to protect his or her interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability.

(y) Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

(z) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

(aa) Causing coercion and duress as the result of the time and nature of a sales presentation.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

(dd) Subject to subdivision (ee), representations by the manufacturer of a product or package that the product or package is [degradable, biodegradable or photodegradable].

(ee) Representing that a product or package is degradable, biodegradable, or photodegradable unless it can be substantiated by evidence that the product or package will completely decompose into elements found in nature within a reasonably short period of time after consumers use the product and dispose of the product or package in a landfill or composting facility, as appropriate.

(ff) Offering a consumer a prize if in order to claim the prize the consumer is required to submit to a sales presentation, unless a written disclosure is given to the consumer at the time the consumer is notified of the prize and the written disclosure meets all of the [enumerated] requirements [in subparagraphs (i)-(iv) regarding type style, description and terms and conditions.]

(gg) Violating 1971 PA 227, MCL 445.111-445.117 in connection with a home solicitation or telephone solicitation. . . .

(hh) Except as provided in subsection (3), requiring a consumer to disclose his or her social security number as a condition to selling or leasing goods or providng a service to the consumer [except in the listed limited circumstances in subparagraphs (i)-(v).

(ii) If a credit or debit card is used for payment in a consumer transaction, issuing or delivering a receipt to the consumer that displays any part of the expiration date of the card or more than the last 4 digits of the consumer's account number [except in certain specified limited circumstances].

jj.  Violating section 11 of the identity theft protection act, 2004 PA 452, MCL 445.71.

(kk) Advertising or conducting a live musical performance or production in this stat through the use of false, deceptive or misleading affiliation, connection or association between a performing group and a recording group [except under the five limited circumstances provided in subparagraphs (i)-(v).

Furthermore, the practice of law is a "heavily regulated" profession.  The

Michigan Supreme Court has established the Attorney Grievance Commission under

M.C.R. 9.108, and the Attorney Discipline Board under M.C.R. 9.110 to regulate the

practice of law in this State.  As such, the practice of law is exempt from the MCPA

pursuant to the exemption in M.C.L. § 445.904(1)(a), which provides:

> (1) This Act does not apply to either of the following:
>
>> (a) a transaction or conduct specifically authorized under laws
>> administered by a regulatory board or officer acting under
>> statutory authority of this state or the United States.

The Michigan Supreme Court has determined that the relevant inquiry under this

exemption is whether the general transaction is specifically authorized by law, regardless

of whether the specific misconduct alleged is prohibited.  *See Liss v. Lewiston-Richards,

Inc.*, 478 Mich. 203, 732 N.W.2d 514 (2007).  Here, the general transaction -- the

execution of an Order to Seize Property  -- was specifically authorized by law.

Therefore, pursuant to *Liss*, the activities complained of which arise out of the execution

are exempt under § 445.904(1)(a).

For all of these reasons, the Court concludes that Plaintiffs have failed to state a

legally cognizable claim for violation of the Michigan Consumer Protection Act.

Therefore, Count III of Plaintiffs' Complaint will be dismissed, with prejudice.

E.     MICHIGAN DOES NOT RECOGNIZE A CIVIL CAUSE OF ACTION

M.C.L. § 445.903(1).

As an initial matter, the Court notes that "extortion" is a criminal act under M.C.L. § 750.213.  Michigan, however, does not recognize a civil cause of action for extortion.  *See Postell-Russel v. Inmont Corp.*, 691 F. Supp. 1, 13 (E.D. Mich. 1988); *Kaul v. Raina*, 2004 WL 405920 at * 3 (Mich. App. 2004); *McLarney v. Board of Road Commissioners for Macomb County*, 2005 WL 3008591 at * 8 (E.D. Mich. 2005).  There being no legally cognizable claim for extortion in Michigan, Plaintiffs' Count XIII claim for "extortion" will be dismissed.

F.     THE TORT OF INTENTIONAL INFLICTION OF EMOTIONAL
       DISTRESS HAS NOT BEEN ADOPTED INTO MICHIGAN
       JURISPRUDENCE

Similarly, the Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence.  *See Smith v. Calvary Christian Church*, 462 Mich. 679, 686 n. 7, 614 N.W.2d 590, 593 n. 7 (2000); *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 907 (1985); *Khalifa v. Henry Ford Hospital*, 156 Mich. App. 485, 499, 401 N.W.2d 884, 890 (1987); *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir.1998).  However, the Michigan Court has described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the
> defendant's conduct had been extreme and outrageous.  It has not been
> enough that the defendant acted with an intent which is tortious or even
> criminal, or that he had intended to inflict emotional distress, or even that

his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Roberts v. Auto Owners, supra*, 422 Mich. at 602-603, *quoting* Restatement 2d of Torts, § 46, comment d.

Applying the standards enunciated by the *Roberts* court, Plaintiffs' claim for intentional infliction of emotional distress in this case fails. At best, here, we have two Defendants -- McKenna and Patterson -- who went to execute a duly-issued Court Order to Seize Property, and in accordance with the specific directives contained in that Order, demanded money and property to be turned over to them to satisfy Plaintiff Adams' unpaid judgment. There are no allegations of any physical restraint or abuse. Nor are there any allegations that Defendants ransacked or even searched Plaintiffs' property. Plaintiffs complain only that Defendants "traumatized" Plaintiff Adams and her siblings

(who are not parties to this action, and hence, have no standing to complain of Defendants' conduct) by directing Plaintiff Adams and her siblings to stay together in the kitchen area of the house and threatened to arrest Plaintiff Adams if she did not give them money to satisfy her indebtedness. These actions simply do not amount to conduct "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, to be regarded as atrocious, and utterly intolerable in a civilized community." Accordingly, Plaintiffs' IIED claim in Count X likewise will be dismissed.

G.    PLAINTIFFS' CLAIM OF CONVERSION OF MONEY SIMILARLY
        LACKS MERIT

Michigan defines the tort of conversion as "any distinct act of domain *wrongfully* exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co*., 439 Mich. 378, 391, 486 N.W.2d 600 (1992) (emphasis added). Plaintiffs have failed to make out a legally cognizable claim of conversion here because they cannot show that Defendants *wrongfully* took her money. Defendant McKenna was acting pursuant to a duly-issued court order which directed him to "seize [Adams'] personal property. . . includ[ing], but not limited to. . . *money*" to satisfy the judgment.

Adams does not dispute that she stopped paying on her car note. Nor does she dispute that her creditor sued her and obtained a default judgment in the amount of $9,607.55. She does not dispute that she has not paid what she owed on the judgment. She further does not dispute that the Order to Seize Property was a validly issued court

order.  Because Defendant McKenna seized $600 from Adams pursuant to the court order

directing him to seize money to satisfy her indebtedness she cannot be heard to argue that

McKenna *wrongfully* took her money.   Under these circumstances, no action for

conversion will lie.  Therefore, Plaintiffs' Count XII claim for "conversion of money"

will be dismissed.

H.      PLAINTIFFS SIMILARLY CANNOT MAKE OUT A CLAIM OF TRESPASS

A trespass is an *unauthorized* invasion upon the private property of another.

*Cloverleaf Car Co. v. Phillips Petroleum Co.*, 213 Mich. App. 186, 195, 540 N.W.2d 297

(1995) (emphasis added).  Just as Plaintiff cannot show that Defendants *wrongfully* took

her money neither can she show that Defendant McKenna's and Patterson's entry into her

home was *unauthorized*.  As indicated, Defendants were acting pursuant to a duly issued

valid court order that commanded that Plaintiff Adams' personal property and/or money

be seized "wherever located."

Furthermore, Plaintiff Adams admits she consented and let McKenna and

Patterson enter her house.  Although Plaintiff claims that she let Defendants into the

house because they said they were police officers, even if fraudulently induced, where

consent is given, no claim for trespass will lie.  *See American Transmission Inc. v.*

*Channel 7 of Detroit, Inc.*, 239 Mich. App. 695, 708-9 & n. 7, 609 N.W.2d 607, 614 & n.

7(2000); *see also See also Baugh v. CBS, Inc*., 828 F. Supp. 745, 757 (N.D. Cal., 1993)

("In a case where consent was fraudulently induced, but consent was nonetheless given,

plaintiff has no claim for trespass."); *Martin v. Fidelity & Casualty Co. of New York*, 421 So.2d 109, 111 (Ala., 1982) (" '[A]n action for trespass . . . will not lie unless plaintiff's possession was intruded upon by defendant without his consent, even though consent may have been given under a mistake of facts, or procured by fraud . . . .' ") (citation omitted).

The authorities above make clear that no action for trespass will lie under the circumstances presented in this case. Therefore, Count VI will be dismissed.

I.     PLAINTIFFS HAVE NOT MADE OUT A COGNIZABLE CLAIM OF
       INTRUSION

"Intrusion upon seclusion" is an invasion of privacy tort. *See* Prosser, Torts 4th ed. § 117. To establish a claim of intrusion, a plaintiff must show: (1) an intrusion by the defendant, (2) into a matter which the plaintiff has a right to keep private, (3) by the use of a method which is objectionable to a reasonable person. *Duran v. The Detroit News, Inc*, 200 Mich .App 622, 631; 504 NW2d 715 (1993). The tort, thus, requires, at a minimum, the discovery by defendants of a secret or private matter. *Hall v. Citizens Ins. Co. of America*, 141 Mich. App. 676, 685 368 N.W.2d 250, 254 (1985). Plaintiffs here have not alleged any such discovery by Defendants. There is simply no factual support for this claim. Therefore, Count XI will also be dismissed.

J.     PLAINTIFFS HAVE COME FORWARD WITH NO FACTS TO
       SUPPORT THEIR CLAIM OF ABUSE OF PROCESS

In Count X of their Second Amended Complaint, Plaintiffs allege a claim of abuse

of process. "To recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose, and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30; 312 NW2d 585 (1981). A meritorious claim of abuse of process occurs in "a situation where the defendant has used a proper legal procedure for a purpose collateral to the intended use of that procedure." *Bonner v. Chicago Title Ins Co.*, 194 Mich. App. 462, 472; 487 NW2d 807 (1992). The plaintiff must provide evidence of a "corroborating act that demonstrates the ulterior purpose," because "[a] bad motive alone will not establish an abuse of process." *Id.* Here, Plaintiffs have not alleged, let alone proven, an ulterior purpose on the part of Defendants. Therefore, they have failed as a matter of law to establish a cognizable claim. Count X, accordingly, will be dismissed.[20]

K.    QUESTIONS OF FACT REMAIN AS DEFENDANTS REZNICK'S AND DPM'S LIABILITY ON PLAINTIFFS' CLAIMS OF FRAUD AND FALSE IMPRISONMENT

The only common law claims alleged by Plaintiffs that arguably have any factual support are their claims for fraud and false imprisonment in Counts VII and IX.

Actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the

---

[20]  Because the Court finds no legal merit in any of the above-discussed state law claims, Plaintiffs' state law conspiracy claim (Count V) predicated upon the substantively dismissed claims will be dismissed, as well.

representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976); *Belle Isle Grill Corp v. Detroit*, 256 Mich. App 463, 477; 666 N.W.2d 271 (2003) Fraud, however, must be established by clear and convincing evidence, rather than a preponderance of the evidence, and may never be presumed. *Foodland Distributors v. Al-Naimi*, 220 Mich. App 453, 457, 459; 559 N.W.2d 379 (1996). Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. *Hi-Way Motor Co., supra.*

Plaintiffs here rely upon Defendants McKenna's and Patterson's alleged misrepresentation that they were "Sheriff's deputies." *See* Plaintiffs' Second Amended Complaint, ¶ 81. This, according to Plaintiffs "impl[ied] that they [McKenna and Patterson] were on police business." *Id.*[21] Plaintiffs state that Adams relied upon this allegedly "false and material misrepresentation"[22] and let Defendants enter her house, to her detriment. Adams Aff., Plaintiffs' Ex. 3, ¶ 72.

The elements of false imprisonment are (1) an act committed with the intention of

---

[21] Plaintiff Adams states in her affidavit that McKenna and Patterson announced that they were "police officers" and "[t]hinking they were police officers on legitimate law enforcement business. . . let them enter the home." Adams Aff., Plaintiffs' Ex. 3, ¶¶ 4, 6.

[22] Plaintiff also claims that Defendants "falsely represented that their actions were lawful and that they could remove and confiscate their property to satisfy Adams' debt." This, however, is not a false misrepresentation as the Order to Seize Property authorizes the removal and confiscation of "personal property. . . and money." Therefore, Plaintiffs may not predicate their fraud claim on this representation.

confining another, (2) the act directly or indirectly results in such confinement, and (3)

the person confined is conscious of his confinement. *Walsh v. Taylor*, 263 Mich. App

618, 627, 689 N.W.2d 506 (2004); *Moore v. Detroit*, 252 Mich. App 384, 388; 652

N.W.2d 688 (2002),   Brief confinements or restraints, however, are insufficient to

establish false imprisonment. *Id*. at 388.  Plaintiffs here claim that Defendants are liable

to them for false imprisonment because McKenna and Patterson ordered Plaintiff Adams

and her siblings to stay together in the kitchen area of the house until they [Defendants]

were through.

Defendants Reznick and Due Process of Michigan argue that they cannot be held

liable for Plaintiffs' common law torts because neither Reznick nor DPM executed the

writ and did not do anything to control or direct McKenna's and Patterson's actions.

However, Plaintiffs have come forward with some evidence -- albeit minimal -- that

suggests otherwise.  Plaintiff Adams states in her affidavit that McKenna told her that it

was "their [McKenna's and Patterson's] boss, Rob Reznick," who instructed them to get

some money from her, Adams Aff., ¶ 8, and when negotiating with McKenna as to

payment, McKenna had to first "check with his boss, Rob Reznick, before he could

accept the offer of payment by post-dated check." *Id. at* ¶ 20.  Adams further states that

McKenna then "called his boss, Mr. Reznick," who instructed McKenna to demand a

check for $400 (instead of the $300 amount that McKenna allegedly originally demanded

that a check be written for, presumably, before Plaintiff made the "post-dated" check

offer.) *Id.* at ¶ 21. Although both Reznick and McKenna deny that any such phone call was made, the Court cannot decide credibility issues in deciding a motion for summary judgment.

In any event, Adams' affidavit testimony demonstrates that issues of fact remain with respect to the control exercised over McKenna's and Patterson's actions by Defendant Reznick. Reznick owns Due Process of Michigan and both McKenna and Patterson testified that they worked as "independent contractors" for DPM.[23] DPM also processes the collections made by McKenna, handling the accounting and payments to the creditors, and the post-execution payments made by the debtors. Reznick's home address and his DPM Post Office address are listed as the addresses for Defendant McKenna on McKenna's Court Officer Agreement with the 71-A District Court. Reznick and his DPM Post Office address are also listed on the "Receipt for Execution Against Property" given to Plaintiff Adams in this case with instructions that post-execution payments on her defaulted judgment were to be made to Reznick at that DPM address. Furthermore, the 71-A District Court court administrator testified that Orders to Seize Property to be executed by McKenna were routinely placed in a mailbox in the courthouse labeled "Due Process" and Defendant Patterson testified that he picks up

---

[23] Although, as a general rule an employer of an independent contractor is not liable for torts committed by the contractor, *Bosak v. Hutchinson*, 422 Mich. 712, 714 (1985), where the plaintiff can show that the employer had the right to control the manner and means pursuant to which the independent contractor performed his work, the employer may be held liable for the contractor's acts under a *respondeat superior* theory. *See Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich. App. 543, 553 (1992).

Orders to Seize Property from the court for McKenna to execute from that "Due Process" labeled box.

Given the evidence showing the intertwining of these process server defendants and because Plaintiffs have produced some evidence suggesting that Defendant Reznick exercised at least some minimal degree of control over the execution conducted by McKenna and Patterson, summary judgment in favor of Reznick and DPM on the basis of no *respondeat superior* liability would be inappropriate. Therefore, Defendants Reznick and DPM's motion for summary judgment as to Counts VII and IX will be denied.

L.    <u>PLAINTIFFS' MOTION FOR SANCTIONS</u>

Finally, the Court will address briefly Plaintiffs' motion for sanctions against Defendant Reznick and his attorney. In Plaintiffs' Motion to Advise the Court About Defendant Reznick's Conduct, Plaintiffs focus on allegedly numerous complaints -- made by other plaintiffs in other actions, *not* any of the parties in this action -- against Defendant Reznick. Plaintiffs seek sanctions against Reznick because he allegedly failed to disclose in his interrogatory answers and deposition testimony *all* of the lawsuits in which he has been named as a defendant. Plaintiffs further criticize Reznick's attorney for giving them a supplemental list of lawsuits several months after Reznick provided his original answers to interrogatories seeking this information.

First of all, Reznick's attorney acted entirely in accordance with the Federal Rules

of Civil Procedure which *require* supplementation of discovery responses after initial responses are given when such supplementation is called for. *See* Fed. R. Civ. P. 26(e). Therefore, there is nothing sanctionable about his conduct. Second, Plaintiffs suggest that Reznick lied when he failed to identify every lawsuit in which he has been sued. Plaintiffs have provided a list of cases they claim to have discovered themselves in which they claim Reznick was sued but failed to disclose these lawsuits to them in discovery. However, the Court's own examination of the dockets of these various cases show that in a number of them, Reznick was not sued; *he was the plaintiff*. And in several others, though Reznick may have been originally named in the complaints as a party-defendant, *he was never served*. Hence, it would not be unlikely that he did not know that he was sued in those cases. In short, the Court sees nothing "fraudulent or obstructionist" in Defendant's conduct.

For these reasons, Plaintiffs' Motion for Sanctions **[Dkt. No. 81]** will be denied.

<u>CONCLUSION</u>

For all of the reasons stated in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants Robert Reznick's and Due Process of Michigan, Inc.'s Motion for Summary Judgment **[Dkt. # 95]** is GRANTED, IN PART, AND DENIED, IN PART. Defendants' Motion is GRANTED, and all of Plaintiffs' claims against these Defendants are DISMISSED *except* Plaintiffs' Section 1983 claim against Defendant Reznick in Count I and Plaintiffs' claims of *respondeat superior* liability against Defendants Reznick and Due Process of Michigan on their state law fraud and false imprisonment claims in Counts VII and IX.

Accordingly, this case will proceed to trial on Plaintiffs' Section 1983 claim in Count I against Defendants McKenna, Patterson and Reznick; and Plaintiffs' fraud and false imprisonment claims in Counts VII and IX against Defendants McKenna, Patterson, Reznick and Due Process of Michigan, Inc.

SO ORDERED.

s/Gerald E. Rosen\
United States District Judge

Dated: September 30, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry\
Case Manager